ALLEN, Appellant, vs. ZABEL and others, Respondents.

*February 6—March 4, 1952.*

*Leon Feingold,* attorney, and *Cleland P. Fisher* of counsel, both of Janesville, for the appellant.

*Crosby H. Summers* of Janesville, for the respondents.

FRITZ, C. J.   The plaintiff, Vernon Allen, was injured while working as an employee of the Fairbanks Morse & Company (hereinafter called "Fairbanks"), on its private factory grounds. The defendant, Alfred Zabel—an employee of the Motor Transport Company—was backing a tractor-trailer unit in a covered entranceway, called a canopy, which was forty-two and one-half feet long and which led to Fairbanks' "navy building." The accident occurred while Allen was standing on the rear platform of a "Clark lift truck"—ten feet long and three feet wide—which he was operating while facing in a northerly direction with the controls and whole machine in front of him, so that he could manipulate and operate a hoist and other levers to disengage a "skid box" located near the northwest corner of the west entrance doorway of the canopy. The right side of the Clark truck was four and one-half feet from the west wall of the canopy and about one-half foot beyond an imaginary line extending from the four-feet-wide west doorjamb of the west twelve-feet-wide doorway entrance to the canopy, leav-

ing a space of about eleven and one-half feet for motor vehicles to back northward through that entranceway. The Clark truck was stationed close to and almost parallel to the west wall of the canopy, and was partly underneath and behind a skid box; and the rear of the Clark truck on which Allen was standing was about eighteen feet from the inner side of said canopy entrance.

On the occasion in question Zabel had parked his tractor-trailer unit so that the rear of it extended two to two and one-half feet east of the west line of the doorway entrance; and it was out of Allen's vision. Zabel then walked northward into the navy building to see the shipping clerk for information and then walked back again through the east-entrance doorway of the canopy to his parked unit without observing or noticing anything in the canopy at that time. He testified that the over-all length of the tractor-trailer unit was thirty-eight feet, ten inches, and the over-all width was eight feet. It had rear-view mirrors on each side, but the small rear-view mirror on the right-hand side was set at such an angle that the driver could not see the rear part of the right side of his trailer or anything directly behind the trailer,—this area being a complete blind spot. The tractor also had a horn and a muffler which made more noise when the tractor backed than an ordinary automobile but made less noise when it was being backed slowly; and it would be difficult to hear when there were other noises.

When Zabel started to back the unit northward through the west doorway, Allen had returned to the canopy to move the skid. Standing on the rear platform of the Clark truck and looking northward, Allen brought his lever back to the middle, pushed the clutch down, brought it to reverse and backed up a foot to determine if he was loose from the skid so it would not drag along with him. He came to a complete standstill and was facing northerly and noticed that he was loose from the skid and glanced around to his right *and as*

*he did so his right arm was crushed by the right rear of the tractor-trailer unit driven by Zabel, between the wrist and elbow, against the right-hand side of the truck.*

Allen testified it had been his experience prior to the time in question that when working in the canopy entranceways, the drivers of vehicles backing into the canopy would pull up, stop, and honk their horns so that someone inside the navy building would open the doors for them; but that during the time he was operating the Clark truck he did not hear a horn or signal or warning from anyone and if any horn had been sounded he would have heard it. It is undisputed that from the time Zabel parked his unit and commenced backing to the canopy itself he did not sound his horn.

Zabel testified that in backing the entire distance it was impossible to drive in a perfectly straight line; that the tractor-trailer would not vary as much as a couple of feet; that as he continued to back northward, with his limited vision he could see the doors up to ten feet of where the accident occurred; that it took a second, or less than a second, to move his unit ten feet and he kept right on going up to the time of the accident; that after he reached a point where the truck was straightened out, it became impossible for him to see anything along the entire right side of his truck and the position he had placed himself in operating and backing up from that point on made it impossible for him to see anywhere on the right-hand side, and he knew when he assumed that position that he would be unable to see except on the left side of his trailer; that the rear-view mirror on the right-hand side is only a small mirror and is set at such an angle that it is not supposed to give the driver very much of a picture behind him and he could not see anything directly behind the trailer with it; and that he did not see anything behind him with the limitations he was under prior to the crash. Allen testified that a man,

in the position which Zabel indicated he was seated in his cab after he had straightened out his unit, could have seen, if he had looked, back in the corner were Allen was working.

The jury found:

(1) That Zabel failed to use ordinary care in keeping a proper lookout; and in sounding his horn or giving other signal of his intention to back the tractor-trailer; and that he ought in the exercise of ordinary care to have foreseen that injury might probably result from such failure and negligence.

(2) That Allen failed to use ordinary care in keeping a proper lookout for his own safety; in failing to sound his horn or give other signal of his intention to back the Clark lift truck; and that he ought in the exercise of ordinary care to have foreseen that some injury might probably result from such failure and negligence.

(3) That of the total causal negligence: Thirty per cent was attributable to Zabel; and seventy per cent was attributable to Allen.

On the motions after verdict the court denied plaintiff's motion for a new trial and granted defendants' motion for judgment on the verdict dismissing plaintiff's complaint.

On this appeal, plaintiff contends the court erred in sustaining the jury's verdict. Upon our review of the record, it is evident that there was ample credible proof to sustain the jury's findings and warrant the trial court's conclusions approving the verdict and entering the judgment dismissing plaintiff's complaint and Fairbanks' cross complaint.

The plaintiff Allen contends the court erred in admitting in evidence a hand-drawn, unverified sketch, not drawn to scale, which was made by Glen Bare, who was an employee of the cross complainant, Fairbanks. The plaintiff claims the sketch was more prejudicial than the sketch in *Schwellenbach v. Wagner*, 258 Wis. 526, 46 N. W. (2d) 852; and that the use of the sketch was equally prejudicial in that independent facts were presented to the jury which were not

supported by any credible evidence. The defendants contend they were within their rights to impeach Bare with his former testimony given on his adverse examination because Bare was an employee of Fairbanks, which in this action is an adverse party to the defendants. Consequently, as Bare was an adverse witness and called as such, and no objection was made at the time he was examined as to his being an adverse witness, the sketch was admissible. His hostility is shown in the record by reference to his testimony when called by defendant Fairbanks as their witness on rebuttal; and the defendants-respondents were within their rights to use a memorandum made by Bare for the purpose of refreshing his memory or impeaching him.

*By the Court.*—Judgment affirmed.